499 So.2d 173 (1986)
Thomas E. TAYLOR and Mary Michaud Taylor, Plaintiffs-Appellants,
v.
Robert MITCHAM, II, and Commercial Union Insurance Company, Defendants-Appellees.
No. 18084-CA.
Court of Appeal of Louisiana, Second Circuit.
October 29, 1986.
*174 Bruscato, Loomis & Street by C. Daniel Street, Monroe, for plaintiffs-appellants.
Davenport, Files & Kelly by Ramsey L. Ogg, Monroe, for defendants-appellees.
Before JASPER E. JONES, NORRIS and LINDSAY, JJ.
JASPER E. JONES, Judge.
This is an appeal of a judgment rejecting a claim for general damages, medical expenses and lost wages relating to the death of a fetus. The plaintiffs-appellants are Mary Michaud Taylor and her husband, Thomas E. Taylor. The defendants-appellees are Robert Mitcham, II and his liability insurer first named as the Commercial Union Insurance Company and then identified in the pleadings to be the Northern Assurance Company.
We affirm.

FACTS
On January 12, 1984, Mary Michaud Taylor was involved in a traffic accident where her stationary vehicle was struck from the rear by an automobile operated by the son of Robert Mitcham, II. Northern Assurance Company insured the Mitchams at the time of the accident. Mary Taylor was wearing a lap belt-shoulder harness seat belt when her vehicle was struck and she sustained a whip-lash type injury to her upper torso and lower abdomen. She was pregnant at the time of the accident, having conceived in mid-December of 1983, but this condition did not become known to her until January 28, 1984.
The day after the traffic accident Mary Taylor saw Dr. Frank X. Cline, Jr., an orthopedic surgeon, for complaints of pain to her neck and back. Dr. Cline ordered x-rays taken and no lead apron or other radiation protection was used. Dr. Cline also prescribed medication for Mary Taylor. One drug was Robaxin, a muscle relaxer. Mary Taylor was to take two 500 mg. tablets twice a day for two or three weeks. The other drug was Darvocet, a pain killer. The prescribed dosage is not known but she was to take one tablet every four hours as needed and was given enough tablets for a 10 day period. Mary Taylor later took the Robaxin as prescribed for approximately two weeks but only took the Darvocet for four days. Dr. Cline also recommended physical therapy and later that day Mary Taylor underwent an ultrasound examination, hydrocollator treatment (low electrical voltage to stimulate muscles) and a massage. She only participated in the therapy once due to the resulting discomfort.
On January 28, 1984, Mary Taylor discontinued taking the Robaxin as she suspected that she was pregnant. This suspicion was confirmed by medical tests three days later and on February 15, 1984, she saw Dr. Cline who recommended she not resume taking the medications due to possible adverse effects on her pregnancy.
*175 On February 22, 1984, Mary Taylor began seeing Dr. Robert G. Jarrell, Jr., an obstetrician-gynecologist. On March 3, 1984, she began experiencing difficulties in the form of cramps and vaginal bleeding. Fetal non-viability was detected on April 13, 1984, and she was hospitalized three days later. A miscarriage was induced on April 17, 1984.
The plaintiffs filed suit seeking, in relevant part, general damages, medical expenses and lost wages all related to the wrongful death of the fetus.
Mary Taylor testified at trial that she was 27 years old and had borne two children after normal pregnancies prior to the accident and was seven months pregnant at the time of trial. She also related that the voltage used in the electrical stimulations, as part of the physical therapy, was strong enough to be felt in a necklace she wore and in the metal retainers in her teeth.
Dr. Cline was accepted as an expert in the field of orthopedic surgery and testified by deposition he recommended Mary Taylor discontinue taking the prescribed medication as they were contraindicated for pregnancies. He also related that this advice was purely precautionary as he perceived no adverse effects from the drugs to her physical condition. He deferred an opinion as to any effect on the fetus to her obstetrician.
Dr. Jarrell was accepted as an expert in obstetrics and gynecology and testified by deposition that 15%-20% of early pregnancies terminate spontaneously with no known medical cause. He further related that early pregnancies are very difficult to predict in regard to the medical cause of fetal death and that he has knowledge of pregnant women who had a history of normal pregnancies, who had been involved in minor traffic accidents and undergone similar trauma, x-rays, contraindicated medication and physical therapy and who had later carried the fetus to a full term normal childbirth. Dr. Jarrell also related that an autopsy of the fetal remains would not establish the cause of the miscarriage and that he could not say why the fetus died.
Throughout Dr. Jarrell's 33 page deposition, in response to numerous questions by plaintiff's attorney, he refused to relate Mrs. Taylor's accident and the treatment of her injuries to the miscarriage. Dr. Jarrell concluded his testimony by stating:
"I can only tell you that in my experience those have not been factors that create pregnancy loss in my experience. They're going to have about, as I said previously, about fifteen percent pregnancy loss no matter what they take."
In written reasons for judgment, the trial court relied heavily upon the testimony of Dr. Jarrell in ruling that the plaintiffs had not proven the accident or the resulting treatment were substantial factors in causing the miscarriage. The court also acknowledged the plaintiff's contention that they enjoy a presumption that the accident and resulting treatment was the legal cause of the miscarriage due to her otherwise healthy condition prior to and after the accident but ruled that they had not proven a reasonable possibility of a causal nexus. By judgment rendered December 5, 1985, the plaintiff's claim for general damages, medical expenses and lost wages relating to the miscarriage were rejected.
The plaintiffs have appealed and the defendants have replied in brief. The plaintiffs' two assignments of error present the following issue for decision:
Whether the trial court erred in not ruling that the defendants had the burden to overcome a legal presumption of causation and, in the alternative, in not ruling that the plaintiffs had proven the legal causation of the miscarriage.

LAW ON THE PRESUMPTION OF LEGAL CAUSATION
A defendant's conduct is actionable under a theory of negligence or strict liability where it is both a cause in fact of the injury and a legal cause of the harm incurred. The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained. The legal causation test requires that there *176 be a substantial relationship between the conduct complained of and the harm incurred. Fowler v. State Farm Fire & Cas. Ins. Co., 485 So.2d 168 (La.App. 2d Cir. 1986), writ den., 487 So.2d 441 (La.1986). The law recognizes that a medical condition producing disability is presumed to have resulted from an accident if before the accident the injured person was in good health but shortly after the accident the disabling causing condition manifested itself, provided there is a reasonable possibility of a causal connection between the accident and the condition. In order for such a legal presumption to apply, the plaintiff must prove, inter alia, that there is a reasonable possibility of a causal nexus. Heath v. Northgate Mall, Inc., 398 So.2d 132 (La.App. 3d Cir.1981); Boykin v. Washington, 401 So.2d 488 (La.App. 2d Cir.1981). The plaintiff must show proof by a reasonable preponderance of the evidence of such a causal nexus and a mere possibility of such a connection is insufficient. Boudreaux v. Terrebonne Parish Police Jury, 477 So.2d 1235 (La.App. 1st Cir. 1985).

Should the presumption apply?
The plaintiffs argue the medical evidence establishes a reasonable causal nexus between the defendant's conduct and the miscarriage and that they benefit from a legal presumption of causation. In the alternative they argue that this same medical evidence satisfies the normal requirements for proving liability.
The record establishes that Dr. Cline testified the plaintiff suffered no adverse effects from his prescribed medical treatment and that he recommended discontinuing the medication and x-ray examination purely as a precautionary measure. He offered no opinion as to the cause of the miscarriage.
Dr. Jarrell testified that 15%-20% of all early pregnancies terminate spontaneously with no known medical cause. In regard to the trauma of the accident he testified it would be unlikely to cause the miscarriage as the fetus is, in general, very well protected from the force of such a collision. In addition the force exerted on the wall of the uterus would not have been very great due to its size in the early time frame of the plaintiff's pregnancy. In regard to the medication, he testified the drugs prescribed by Dr. Cline were not "blacklisted" but only contraindicated for pregnancies and not to be used unless the benefits outweighed the disadvantages. He related he had known patients on various contraindicated drugs who had delivered perfectly normal babies. In regard to the x-ray examination he related that he was aware of patients who had undergone multiple x-ray treatments and who didn't experience an abortion. He deferred giving an opinion on this treatment and suggested that a radiologist would provide more information on the effects of the radiation dosage on the patient. In regard to the effects of the ultrasound examination, hydrocollator treatment and the physical therapy he again deferred an opinion to an appropriate specialist. Dr. Jarrell concluded by relating he did not know why the miscarriage occurred. He again and again refused to conclude that the accident or the treatment of Mrs. Taylor's injuries sustained in it were factors contributing to the miscarriage.
The record also shows that the trial court considered the merits of the plaintiffs' argument under both theories of liability and ruled that the medical evidence established the defendant's conduct and the resulting medical care were neither substantial factors nor reasonably causally related to the resulting miscarriage.
We conclude that the trial court did not err in rejecting both theories of liability. Our review of the depositions and the trial testimony confirms the conclusions of the trial court that the medical evidence falls far short of that needed to establish liability. The mere possibility of a causal nexus is insufficient to make applicable the legal presumption or to prove legal causation. The plaintiffs had the burden of proof. There was no medical evidence offered other than the depositions of Dr. Cline and Dr. *177 Jarrell which, themselves, were of no help to the plaintiffs' cause. The trial court was correct in rejecting the plaintiffs' demands.

CONCLUSION
The judgment is AFFIRMED. All costs of this appeal are assessed against the plaintiffs.